## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

LISA C.,[1]                                             Case No. 1:21-cv-496

      Plaintiff,                                    Cole, J.
                                                        Bowman, M.J.

    v.

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.


### REPORT AND RECOMMENDATION

Plaintiff Lisa C. filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. § 405(g). Proceeding through counsel, Plaintiff presents two claims of error for this Court's review. The Commissioner's finding of non-disability should be AFFIRMED because it is supported by substantial evidence in the record as a whole.

### I. Summary of Administrative Record

This case represents Plaintiff's second judicial appeal in this Court. On February 5, 2016, Plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging she became disabled on July 28, 2015, based upon a combination of physical and mental impairments. After her claim was denied initially and upon reconsideration, Plaintiff requested an evidentiary hearing before an Administrative Law Judge ("ALJ"). On June 30, 2018, Plaintiff appeared with counsel and gave testimony before ALJ Cristen

---

[1]Due to significant privacy concerns in social security cases, this Court refers to claimants only by their first names and last initials. *See* General Order 22-01.

1

Meadows; a vocational expert ("VE") also testified. (Tr. 41-86). On July 30, 2018, ALJ Meadows issued an adverse written decision, concluding that Plaintiff was not disabled. (Tr. 23-36; 865-878).

The Appeals Council initially declined further review. However, after Plaintiff filed an appeal in this Court, *see* Case No. 1:19-cv-1069, Plaintiff won remand pursuant to a joint stipulation of the parties. (Tr. 891-893). Although no specific grounds were cited for remand by the Court, a subsequent Order dated September 24, 2020 from the Appeals Council directed the ALJ to re-evaluate the opinions provided by a consulting psychologist.

On March 30, 2021, ALJ Meadows conducted a new telephonic hearing at which Plaintiff and a vocational expert again testified. (Tr. 784-818). On April 30, 2021, the ALJ issued a second adverse decision. After the Appeals Council again declined further review, Plaintiff filed a second judicial appeal, alleging that the ALJ committed the same error on remand with respect to the consulting psychologist's opinions, and committed further error by rejecting the opinion of her treating psychiatrist. In addition to those two errors, Plaintiff argues that a fundamental constitutional defect in the statutory structure of the Social Security Administration requires remand of this case to be decided by a new ALJ and/or Appeals Council.

Plaintiff was 34 years old on her alleged disability onset date, and remained in the same "younger individual" age category on the date of the ALJ's most recent adverse decision. She has a high school education, with some college, and previously worked as an order filler at the medium exertional level, as well as a cashier, stocker, and retail attendant, work which she performed at exertional levels ranging from light to heavy. (Tr.

2

774).  At the time of her most recent hearing, she testified that she was living with her parents and her ten-year-old daughter.  (Tr. 792).

The ALJ determined that Plaintiff had engaged in work activity after her alleged onset date, in both 2016 and from 2019-2020, but that her earnings fell slightly below the "substantial gainful activity" level.  Specifically:

> The claimant earned $10,229 in 2016 from Amazon, $828 in 2019 from Rural King, $5,368 from Clossman Catering, $1,770 in 2019 from O'Reilly Auto Enterprises, and $13,153 in 2020 from RK Administrative Services (Rural King) (14D, pp. 3-4). The claimant testified to currently working twenty hours a week, earning $11.00 an hour in the food department at Rural King since December 2019. Prior to Rural King in 2019, the claimant testified to working at Clossman Catering, putting away returns for three months. She testified that she worked twenty to twenty-four hours a week and earned $10.00 an hour.

 (Tr. 763).

In her most recent decision, the ALJ found that Plaintiff has severe impairments of "diabetes mellitus, degenerative disc disease, tendinitis of the shoulders, carpal tunnel syndrome, periodic limb movement disorder, depressive disorder, anxiety disorder, and personality disorder." (Tr. 763).  In addition, the ALJ found non-severe impairments of obesity, obstructive sleep apnea, hypertension and alcohol use disorder. (*Id.*)  The ALJ further determined that none of Plaintiff's impairments, either alone or in combination, met or equaled any listed impairment in 20 C.F.R. Part 404, Subpt P, Appx. 1, such that Plaintiff would be entitled to a presumption of disability.  (Tr. 764).

The ALJ next determined that Plaintiff could perform light work, subject to the following limitations, throughout the disability period:

> [S]he can frequently climb ramps and stairs, but can never climb ladders, ropes, or scaffolds.  The claimant can frequently stoop, kneel and crouch.  She can never crawl.  She can frequently reach overhead, frequently perform front/lateral reaching with the bilateral upper extremities.  The claimant can understand, remember, and carry out simple, routine tasks in an environment without any fast-paced tasks or strict quotas, such as

> assembly line work.  She should have no interaction with the general public
> and occasional interaction with coworkers and supervisors.  The claimant
> should do no joint tasks and no over-the-shoulder supervision.  She should
> work in an environment with changes in the job setting or job duties
> occur[ring] no more than once per month, where changes are explained in
> advance.

(Tr. 766).

Based upon her RFC and testimony from the vocational expert, the ALJ concluded that Plaintiff could not perform her prior work but still could perform other jobs that exist in significant numbers in the national economy, including hand sorter or grater, housekeeper, and inspector tester.  (Tr. 776). Therefore, the ALJ determined that Plaintiff was not under a disability through the date of her decision.  (Tr. 777).

In this judicial appeal, Plaintiff does not challenge the assessment of her physical RFC limitations.  However, Plaintiff argues that the ALJ erred in assessing mental RFC limitations by improperly evaluating the opinions of a treating psychiatrist, Dr. Peter Boxer, and of an examining psychological consultant, Andrea Johnson, Psy.D.  In addition, Plaintiff separately challenges the statutory structure of the Social Security agency as violative of the separation of powers, such that the Commissioner's delegation of authority to the ALJ and the subsequent adverse decision in this case cannot be upheld.

## II.  Analysis

### A.  Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

4

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.*  (citations omitted); *see also Biestek v. Berryhill*, 139 S. Ct.1148, 1154 (2019) (holding that substantial evidence is evidence a reasonable mind might accept as adequate to support a conclusion and that the threshold "is not high").

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that

5

claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy.  *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits.  20 C.F.R. § 404.1512(a).  A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job.  42 U.S.C. § 423(d)(1)(A).

### B.  Plaintiff's Claims

### 1.  The Constitutional Challenge

For the convenience of the Court, the undersigned first addresses Plaintiff's constitutional challenge.  Plaintiff brings this challenge on the basis of *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S.Ct. 2183 (2020), a case in which the Supreme Court held that an organizing statute that made the Consumer Financial Protection Bureau Director removable only for cause amounted to an unconstitutional restriction on the president's authority to remove the head of an agency, and therefore violated the separation of powers.  *See Seila Law*, 140 S. Ct. at 2197.  Plaintiff argues that because the Commissioner of Social Security also is not subject to removal by the President except for "neglect of duty or malfeasance in office," *see* 42 U.S.C. § 902(a)(3), the structure of the SSA also violates the separation of powers.

The Commissioner concedes that 42 U.S.C. § 902(a)(3) violates the separation of powers "to the extent that it is construed as limiting the President's authority to remove the Commissioner without cause."  (Doc. 10 at 12, citing Office of Legal Counsel, U.S.

6

Dept. of Justice Constitutionality of the Commissioner of Social Security's Tenure Protection, 2021 WL 2981541 (July 8 , 2021) ("OLC OP.").  However, relying upon a more recent separation of powers case, *Collins v. Yellen*, ___ U.S. ___, 141 S. Ct. 1761 (2021), the Commissioner maintains that Plaintiff is not entitled to reversal or remand of the non-disability decision because she was not harmed by the unconstitutional restriction on the president's removal authority.

In *Collins*, a plaintiff alleged that the leadership structure of the Federal Housing Finance Agency was unconstitutional because - as alleged here and in *Seila Law* - the sole head of that agency was removable by the President only for cause.  Despite the unconstitutionality of the removal provision, the Supreme Court clarified in *Collins* that a plaintiff cannot obtain retrospective relief without showing that the "unconstitutional provision… inflict[ed] compensable harm."  *Id*., 141 S. Ct. at 1789.   The *Collins* majority reasoned that unlike an unlawful appointment of an agency head, "the unlawfulness of [a] removal provision" "does not strip [an official] of the power to undertake the other responsibilities of his office."  *Id.* at 1788 n. 23. "As a result…there is no reason to regard any of the actions taken" by an agency during the period in which an unconstitutional removal provision was in effect "as void" absent a specific showing of injury.  *Id.* at 1787.

Since the publication of *Seila Law* and *Collins*, the arguments presented by the parties in this case have been made in similar cases before many district courts within the Sixth Circuit, as well as on a national level.  In a persuasive published decision that is directly on point, the Ninth Circuit rejected arguments that the constitutional infirmity of § 902(a)(3) supports remand in social security cases absent a non-speculative and particularized showing of "actual injury" by the claimant in question. *Kaufmann v. Kijakazi*, 32 F.4th 843, 850 (9th Cir. 2022) (rejecting claim by plaintiff whose appeal to the Appeals

Council was denied while Commissioner Saul served under an unconstitutional removal provision).  The *Kaufmann* court affirmed the denial of relief because the plaintiff did not show, for example, that the President took an interest in her claim, or that the Commissioner directed the Appeals Council to act in a certain way relative to her claim. And the plaintiff's contention that her claim might have been decided differently was too speculative to show a particularized actual injury.  *Id.*

The Sixth Circuit has not yet decided a similar case in the social security context, but recently cited *Kaufmann* with approval when it rejected a similar claim by a plaintiff who was challenging an action by the FDIC.  *See Calcutt v. Federal Deposit Insurance Corporation*, 37 F.4th 293 (6th Cir. 2022).  Even more tellingly, every district judge and magistrate judge within the Sixth Circuit who has been presented with Plaintiff's argument in scores of cases decided to date has rejected it. *See, e.g.*, *Heidi J. D. v. Com'r of Soc. Sec.*, 2022 WL 1555108, at *6 (S.D. Ohio May 17, 2022), *adopted at* 2022 WL 2187238 (S.D. Ohio Jun 17, 2022); *Sandra S. v. Com'r of Soc. Sec.*, 2022 WL 486311 (S.D. Ohio Feb. 17, 2022), *adopted at* 2022 WL 2154921 (S.D. Ohio June 15, 2022); *Alec F. v. Com'r of Soc. Sec.*, 2022 WL 278307, at *5 (S.D. Ohio Jan. 31, 2022), *adopted at* 2022 WL 884022 (S.D. Ohio March 25, 2022); *Crawford v. Com'r of Soc. Sec.*, 2021 WL 5917130, at *8 (S.D. Ohio Dec. 14, 2021), *adopted at* 2022 WL 219864 (S.D. Ohio Jan. 25, 2022). In addition to *Kauffman* and the growing body of unpublished case law within the Sixth Circuit, the undersigned finds persuasive the reasoning of a published district court case in this circuit that addresses this same issue, *Rhouma v. Com'r of Soc. Sec.*, ___ F. Supp.3d ___, 2021 WL 5882671, at *10-11 (N.D. Ohio  Dec. 13, 2021).

In *Rhouma*, the court held that the plaintiff lacked standing to challenge the constitutionality of the SSA's structure based upon her inability to demonstrate any actual injury.[2]

> Rhouma argues that she has standing because her administrative proceedings were conducted pursuant to polices and regulations implemented by [Commissioner] Saul. … But that's not enough. "[T]he unlawfulness of the removal provision does not strip the [Commissioner] of the power to undertake the other responsibilities of his office." *Collins*, 141 S. Ct. at 1788 n.23. As Justice Thomas's concurring opinion clarifies, Rhouma must do more than point to a conflict between 42 U.S.C. § 902(a)(3) and the Constitution; she must show some action on the part of Saul that was unlawful and harmful to her. *See id.* at 1790-91 (Thomas, J., concurring). More to the point, Rhouma must show that the policy and regulatory changes implemented by Saul adversely affected her. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 n.1, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("[T]he injury must affect the plaintiff in a personal and individual way.").

*Id.*, 2021 WL 5882671, at *11. Like the plaintiff in *Rhouma*, Plaintiff here lacks standing because she is unable to demonstrate any actual injury.[3] *Accord*, *Walker v. Com'r of Soc. Sec.*, 2022 WL 1266135, at *5 (N.D. Ohio April 28, 2022) (holding that plaintiff lacked standing, distinguishing unpublished caselaw outside the Sixth Circuit holding to the contrary). Because Plaintiff is unable to demonstrate any particularized injury resulting from the issuance of an adverse decision during the time in which Commissioner Saul served, the undersigned finds no need to address the parties' alternative arguments.

---

[2]*Rhouma* noted that even though the Commissioner had not used the term "standing," its argument that the plaintiff had not established a "nexus" between the removal restriction and alleged harm to the plaintiff had "effectively argued" that plaintiff could not meet "the traceability requirement for standing." *Id.* at *10. The Commissioner makes the same "nexus" argument in this case.

[3]Citing to circumstantial evidence, Plaintiff asserts that President Biden "would have fired Commissioner Saul immediately upon taking office had he believed it was legal," (Doc. 12 at 6), and delayed firing him only until the Department of Justice issued its opinion confirming that the removal restriction violated the separation of powers. But Plaintiff's argument that Commissioner Saul lacked any authority at all after President Biden took office ignores the contrary holding of *Collins* that only an improper appointment can have such effect. Plaintiff further hypothesizes that a different Commissioner might have implemented new policies or directed Appeals Council judges to decide cases in a manner that could have impacted the outcome of her claim. As discussed by the Ninth Circuit in *Kauffman* and by the district court in *Rhouma*, such speculative musings are insufficient to demonstrate actual injury or standing.

9

### 2.  The ALJ's Assessment of the Mental RFC Opinion Evidence[4]

In addition to her constitutional claim, Plaintiff argues that this Court should reverse based upon errors made by the ALJ in the evaluation of two opinions concerning her mental RFC limitations. Because Plaintiff filed her claim for DIB before new regulations took effect on March 27, 2017, an earlier set of regulations applies to her case.  The prior regulations provide for an order of hierarchy in the evaluation of medical opinion evidence, with the opinions of treating physicians to be given the most weight, and the opinions of examining consultants to be given greater weight than the opinions of non-examining consultants.

### a.  Dr. Boxer

Plaintiff argues first that the ALJ erred in evaluating the opinions of her treating psychiatrist, Dr. Peter Boxer.  The regulation that applies to this claim states: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. § 404.1527(c)(2); *see also Warner v. Com'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).  The treating physician rule requires ALJs to give "greater deference to the opinions of treating physicians than to the opinions of non-treating physicians." *See Blakley v. Com'r of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009).  Notably, the rule is not without exceptions.  Thus, controlling weight need not

---

[4]The undersigned's review of this claim was made more difficult by Plaintiff's citation to PageID numbers without citation to Transcript page numbers.  Counsel is reminded that in social security cases, counsel is <u>required</u> to cite to the Administrative Transcript.  *See* Local Rule 8.1.A (d) "When citing to the administrative record in Social Security cases, parties must provide pinpoint citations to the administrative record, regardless of whether a party also chooses to provide PageID citations."

be given to a treating source's medical opinion that is not "well supported by medically acceptable clinical and laboratory diagnostic techniques" or that is "inconsistent with the other substantial evidence in the record." However, a separate articulation requirement requires ALJs to provide "good reasons" when less-than-controlling weight is given to the opinion of a treating physician. *See* 20 C.F.R. § 404.1527(c)(2).

In the case at hand, Plaintiff argues that the ALJ "skipped the first step of the treating source rule" by failing to first articulate whether Dr. Boxer's opinions were entitled to controlling weight before moving on to the "good reasons" analysis. (Doc. 12 at 2; *see also* Doc. 8 at 10-11). It is true that the ALJ did not separately and explicitly first state that she was declining to give "controlling weight" to Dr. Boxer before stating that she was giving "little weight" to his opinions. But the undersigned does not read controlling Sixth Circuit case law or the regulations to mandate a rigidly bifurcated articulation of the controlling weight and non-controlling weight analyses.[5] In fact, the Sixth Circuit has never required any particular format or number of sentences to satisfy the "good reasons" standard, so long as the explanation is sufficient for this Court to understand the basis for the ALJ's decision. *Accord Allen v. Com'r of Soc. Sec.,* 561 F.3d 646, 651 (6th Cir. 2009) (affirming after concluding that ALJ's one-sentence rejection of treating physician's opinion satisfied the "good reasons" requirement); *Smith v. Com'r of Soc. Sec.,* 482 F.3d 873, 877 (6th Cir. 2007) (approving ALJ's decision declining to give treating sources

---

[5]The undersigned acknowledges that several unpublished cases cited by Plaintiff have held to the contrary. *See*, *e.g.*, *Lutz v. Com'r of Soc. Sec.*, No. 3:16-CV-210, 2017 WL 3140878, at *3 (S.D. Ohio July 25, 2017), adopted at 2017 WL 3432725 (S.D. Ohio Aug. 9, 2017) (holding that the failure to first articulate why a treating physician's opinions are not entitled to controlling weight prior to separate articulation of the "good reasons" analysis constitutes reversible error. While a separate two-step articulation may be preferred, the undersigned disagrees that formal two-step articulation is required in every case. The regulatory language does not dictate the manner of articulation other than stating that it must constitute "good reasons" after consideration of additional factors.

controlling weight where ALJ's decision stated that sources' reports were "inconsistent with the overall evidence of record" and sources formed their opinion solely from claimant's subjective symptoms); *Stiltner v. Com'r of Soc. Sec.*, 244 Fed. Appx. 685, 690, 2007 WL 2264414, at *5 (6th Cir. 2007) (holding that ALJ's decision to give "little weight" to treating physician was supported by a "lengthy and thorough discussion of all of the relevant evidence" which is "all that we require.").

When an ALJ does not give controlling weight to a treating physician, as occurred in this case, the Sixth Circuit has explained that the "good reasons" requirement ensures that the stated reasons are

> supported by the evidence in the case record, and …. sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. No. 96–2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996).  This procedural requirement "ensures that the ALJ applies the treating physician rule  and  permits  meaningful  review  of  the  ALJ's application of the rule.

*Gayheart v. Com'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting *Wilson v. Com'r*, 378 F.3d 541, 544 (6th Cir. 2004); *accord Hargett v. Com'r of Soc. Sec.*, 964 F.3d 546, 552 (6th Cir. 2020) ("[A]n ALJ may not summarily discount a treating-source opinion as not well-supported by objective findings or being inconsistent with the record without identifying and explaining how the substantial evidence is purportedly inconsistent with the treating-source opinion.").

Considering the ALJ's analysis of Dr. Boxer's opinions and of the record as a whole in this case, it is sufficiently clear to the undersigned that the ALJ: (1) recognized Dr. Boxer as a treating provider; (2) declined to give Dr. Boxer's opinions controlling weight because she found his opinions to be not well-supported by medically acceptable clinical techniques and also inconsistent with other substantial evidence; and (3) adequately

articulated "good reasons" for giving his opinions "little weight," including by discussing the substantial evidence throughout the record (including many objective clinical records) that stood in stark contrast to Dr. Boxer's otherwise unsupported and extreme opinions.

The record includes six treatment records from Dr. Boxer close in time to when he rendered the opinions on which Plaintiff relies, dating from March 2016 through June 2018. On March 10, 2016, Dr. Boxer saw Plaintiff for the first time. He noted she was transferring care from her primary care physician, with a reported history of being depressed "for much of her life" with "episodic suicidal thoughts since high school." (Tr. 604). Despite "chronically low energy," she was walking an hour daily for exercise. (*Id.*) She had never engaged in self-injurious behavior or attempted suicide and denied physical aggression toward others. (*Id.*) She reported longstanding conflicts with her "hypercritical" mother with whom she was living, including over parenting of her daughter (then 5). (*Id.*) She reported having gotten married the day before to a man she had known since middle school, and that she had been working at the Amazon warehouse but had quit her job recently due to her diabetes and had applied for disability. (*Id.*)

Objectively, Dr. Boxer noted she was on time, alert and fully oriented, with feelings of mistrust "bordering on vague paranoid ideation, but no frank delusions." (Tr. 605). He diagnosed persistent depressive disorder and subsyndromal PTSD based upon her presentation and reported history. He prescribed Effexor and Buspirone and stressed the importance of psychotherapy, asking her to follow up for a medication check in 2 weeks. (*Id.*, *see also* Tr. 770).

At her follow-up visit on March 22, 2016, Plaintiff reported continuing to feel anxious and that she was biting her nails, which she described as "a longstanding habit." (Tr. 601). Dr. Boxer noted that she was angry with her mother and that she was also

13

angry that her ex-husband had been ordered to Talbert House for treatment of his drug addiction. Dr. Boxer noted she had not been compliant with timing the medications he had prescribed, but that she "rejects any suggestions" to improve her compliance. (*Id.*) He added probable personality disorder to her list of diagnoses. (*Id.*)

On May 24, 2016, a social worker with whom Plaintiff apparently had begun therapy,[6] Ryan Lenz, completed a disability questionnaire stating that Plaintiff is "very depressed" and "has flat affect." The form invites the treating source to provide narrative descriptions of functional "limitations" such as concentration/persistence/pace, memory, confusion, frustration tolerance, etc." (Tr. 299). Rather than offering any specific RFC opinions, Mr. Lenz observes that Plaintiff "presents as very angry and easily frustrated," and that her depression, anger, frustration and anxiety "complicate virtually all activities" in her life and "make self care more difficult." (*Id.*) In response to a query asking for details of "significant problems with social interactions…as it would relate to the general public or coworkers/supervisors," Mr. Lenz opines that Plaintiff "fails to interact respectfully and appropriately due to [symptoms]." (Tr. 299). Mr. Lenz concludes with a "disability" statement: "I do not believe client could tolerate stress of employment due to symptoms." (Tr. 300). Although the record includes only the two March 2016 examinations by Dr. Boxer, Dr. Boxer endorsed the social worker's May 24, 2016 opinions by signing off that he had reviewed them and "agree[d]." (Tr. 298).

---

[6]There are no 2016 treatment notes or any records from Mr. Lenz prior to the date of his May 24, 2016 disability form, but he states on the form that Plaintiff began mental health treatment in February 2016. Despite that notation, the earliest mental health record supplied to the ALJ was the March 10, 2016 initial evaluation by Dr. Boxer. *See generally*, Doc. 6-7, Exh. 11F, Tr. 571-610 (identified as records from 3/1/16 through 6/13/18 from Community First Behavioral).

Other than the concluding "disability" statement, the "opinions" expressed on the March 2016 questionnaire are extremely vague, suggesting only that Plaintiff may not interact appropriately with others. Arguably, the mental RFC as determined accommodates that opinion insofar as the ALJ minimized the work stress and social interactions with which Mr. Lenz (and by extension Dr. Boxer) expressed concern. Thus, the ALJ limited Plaintiff to "simple, routine tasks in an environment without any fast-paced tasks or strict quotas," with minimal job changes, "no interaction with the general public and occasional interaction with coworkers and supervisors," and "no joint tasks and no over-the-shoulder supervision." (Tr. 766).

A week after signing off on Mr. Lenz's disability form, on May 31, 2016, Dr. Boxer saw Plaintiff a third time to evaluate the effectiveness of her medications. At that time Plaintiff reported a high level of anxiety stemming from a "recent incident when boyfriend threw things at her head, threatened to kill her." (Tr. 577). She reported that he was now in jail and that she had obtained a temporary protective order which she was planning to go to court later in the week to extend. Plaintiff expressed concern that he would try to harm her once he was released from jail. Dr. Boxer wrote: "Given her current circumstances, she says that she 'doesn't know' if the antidepressant is helping, which is understandable." (*Id*.) Dr. Boxer modified her medications.

The record contains an intervening psychotherapy note from Mr. Lentz, dated January 24, 2017, following Plaintiff's May 31, 2016 visit with Dr. Boxer and before her next documented visit with that physician.[7] Mr. Lentz's January 24, 2017 note states that Plaintiff was 'quiet and calm" and had "nothing to talk about" but reported she had been

---

[7]Plaintiff erroneously refers to this record as originating from Dr. Boxer. (Doc. 8 at 3, 12).

spending time with her daughter at times.  She also reported being "frustrated about not getting disability yet."  (Tr. 581).  Objectively, Mr. Lentz described her appearance as casual and neat, with cooperative behavior,  "clear and coherent" thought process and no abnormalities in thought. (*Id*.)  The only notable findings were a "constricted" affect and "angry/irritable" mood, with "limited" insight and fair judgment.  (Tr. 582).  The record reflects that Plaintiff was making progress toward her therapy goals.  (Tr. 771).

On March 30, 2017, Plaintiff followed up with Dr. Boxer for a fourth visit.  She subjectively reported she remained depressed with "thoughts of 'not wanting to be here', but no active SI [suicidal ideation]."  (Tr. 575).  She described ongoing conflict with her mother over parenting issues with her six-year-old, and stated she feels "tired" despite getting 8 hours of sleep.  Dr. Boxer added a medication (Cytomel) to help improve Plaintiff's mood and directed her to follow up in 6 weeks.  He noted she appeared tired and dejected, but that she was calm, with normal speech, focused thought process and no abnormalities in perception.  (*Id*.)  Although depressed, her affect was stable.  (Tr. 576).

On April 25, 2017, a second therapy note from Mr. Lentz[8] states that Plaintiff was "angry and frustrated."  Despite negative thinking,  she had "no thoughts of self harm or harming others."  (Tr. 585).  Objectively, Mr. Lenz again noted that Plaintiff was cooperative, with clear and coherent thoughts, no perceptual disturbances and no abnormalities of thought.  (*Id*.)  Her affect was "constricted" with an "elevated" mood and with her insight improved to "adequate." She was fully oriented with fair judgment, and had made "some progress" toward her goals.  (Tr. 585-86).

---

[8]Plaintiff again erroneously attributes Mr. Lentz's therapy note to Dr. Boxer.  (Doc. 8 at 3, 12).

On June 28, 2017, Plaintiff followed up with a fifth visit to Dr. Boxer.  She reported feeling more anxious and depressed since learning that her ex-husband was out of prison and in a halfway house in Lebanon, and was concerned he would come to her house even though she had a restraining order.  (Tr. 598).  She had not recently seen a therapist but stated she had an upcoming appointment.  She declined Dr. Boxer's medication recommendation to address her feelings of paranoia and stated she would like to try buproprion instead.  (Tr. 598).  Dr. Boxer noted that Plaintiff frequently interrupted him and had paranoid ideation "but [was] not delusional," with a mood described as depressed and irritable.  (Tr. 598-99).  He prescribed the buproprion she requested.

No further treatment records from Dr. Boxer appear before he completed an April 11, 2018 medical source statement in which he opined that Plaintiff has many "marked" and "extreme" functional limitations, with those terms defined on the attorney-supplied form in a manner that arguably would be work-preclusive.[9]  (Tr. 505-507).  Dr. Boxer also checked "yes" that Plaintiff is "likely to have partial or full day unscheduled absences from work occurring 5 or more days per month due to the diagnosed conditions and/or side effects of medication," and that her condition "would likely deteriorate" if placed under the stress of full time work.  (Tr. 507).  He further opined that her limitations had not changed since July 28, 2015, despite the fact that he did not start treating her until 2016. (*Id.*)

One additional record from Dr. Boxer is dated June 6, 2018, shortly after his medical source statement.  That record notes that Plaintiff appeared on time with fair grooming and no psychomotor agitation.  As the ALJ pointed out, the same record reflects

---

[9]For example, the form defines "marked" impairment as a complete inability to function "from 26% to 50% of the work day or work week" and "extreme" impairment as a complete inability to function "more than 50%" of the work day or week.

Dr. Boxer's objective clinical observations that Plaintiff possessed "normal speech, normal content of thoughts, normal abstract reasoning, and linear and logical associations (Tr. 771, citing Tr. 593-594).

As discussed by the ALJ, Dr. Boxer's April 2018 opinion form was a "check-the-box" form "with no citation to the objective findings relied upon in making these determinations." The ALJ's full analysis of Dr. Boxer's May 2016 and April 2018 opinions reads as follows:

> [L]ittle weight was given to Dr. Peter Boxer, who found some extreme mental health limitations (2F, pp.2-4; 7F, pp.1-3). In May 2016, Dr. Boxer completed a disability questionnaire in which he concluded that the claimant could not tolerate the stress of employment due to symptoms (2F, p.4). However, Dr. Boxer indicated that the claimant just started treatment in February 2016 (2F, p.3). In addition, the only clinical findings provided were "very depressed" and "flat affect" (2F, p.3). Then, in April 2018, Dr. Boxer completed a medical source statement, which noted multiple marked and extreme limitations (7F, pp.1-3). For example, Dr. Boxer concluded that the claimant had an extreme limitation in the ability to accept instruction or respond appropriately to criticism from supervisors or superiors (7F, p.1). In addition, Dr. Boxer opined that she had a marked limitation in the ability to process subjective information accurately and to use appropriate judgment (7F, p.2). Further, Dr. Boxer concluded that she had a marked limitation in the ability to behave predictably, reliably and in an emotionally stable manner (7F, p.2). However, this was a check-the-box form with no citation to the objective findings relied upon in making these determinations (7F, pp.1-3). In the comment section, Dr. Boxer stated that the claimant "has chronic depression with frequent, episodic exacerbation. Her mood can be quite labile. She has longstanding mistrust of others, and is prone to misinterpret others' actions, which can lead to her becoming verbally aggressive" (7F, p.3). I gave little weight to Dr. Boxer's opinions, which must have relied heavily on the claimant's subjective reports of functioning, as his treatment records do not contain objective findings to support such extreme limitations. In addition, Dr. Boxer's opinions are inconsistent with longitudinal treatment record and the claimant's ability to work slightly below substantial gainful activity during the pertinent time period of this decision (18F, pp.67-69; 14D, pp.3-4, for example).

(Tr. 774).

In addition to the above analysis explaining why she gave "little weight" to Dr. Boxer's opinions, the ALJ cited to a multitude of mental health records as well as

employment records that provided substantial longitudinal evidence in direct conflict with Dr. Boxer's opinions. *See Jones v. Com'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("If the treating physician's opinion is not supported by objective medical evidence, the ALJ is entitled to discredit the opinion as long as [she] sets forth a reasoned basis for her rejection.").  Here, the ALJ noted that Plaintiff's mental health treatment had been conservative, consisting solely of medication provided by her primary care provider prior to starting formal mental health treatment in March 2016, which was "one month after filing her application for disability." (Tr. 772)  Although Plaintiff initially engaged in therapy as recommended by Dr. Boxer, she later discontinued therapy, stating that "she doesn't have time." (Tr. 772; *see also* Tr. 1062 (5/28/19 report that her job at auto parts store made it too difficult to schedule counseling)).  Reviewing therapy notes, the ALJ noted that "a lot of the [therapy] treatment focuses on her relationship and feelings towards her ex-husband," but that during that same time period, Plaintiff's "mental status examinations …repeatedly documented normal speech, normal thought processes, linear and logical associations, and intact recent and remote memory." (Tr. 772).  Indeed, treating physicians "consistently noted that the claimant presented with normal mood and affect, normal behavior, and normal judgment and thought content."  (*Id.*, citing multiple examples).

Attempting to undermine this wealth of objective clinical evidence, Plaintiff points to a brief narrative section of the April 2018 check-box form in which Dr. Boxer offered the following explanation for the extreme limitations he endorsed:

> She continues to have unpredictable episodes of depression which impair her daily functioning.  She responds with intense anger when under stress. *I do not know if this has occurred in a work situation.*
>
> * * *

19

> Patient has chronic depression with frequent, episodic exacerbations. Her mood can be quite labile. She has longstanding mistrust of others and is prone to misinterpret others' actions, which can lead to her being verbally aggressive. She is also impulsive and, in my opinion, would be quick to respond to perceived criticism with anger & flight, at best, and possibly with aggressive behavior.

(Tr. 507) (emphasis added).

The ALJ explained why she considered Dr. Boxer's narrative explanation to be inadequate support for the limitations he endorsed, which were unsupported by any medically acceptable clinical observations made by Dr. Boxer in his treatment records. The ALJ further pointed out that Dr. Boxer's mental RFC limitations were inconsistent with other substantial evidence in the record, including but not limited to Plaintiff's extensive work history. While Dr. Boxer diagnosed chronic depression, many people with anxiety and depression remain capable of full-time employment. The ALJ noted evidence that Plaintiff had been able to maintain work activity only "slightly below" SGA since her alleged onset date, and reported her work hours were reduced to 24 hours per week due to cut-backs related to Coronavirus rather than any health conditions. (Tr. 765). Plaintiff's relatively long-term prior employment (seven years at Amazon with prior employment at Walmart for nine years) also undercut subjective reports of severe work limitations since 2015 as Dr. Boxer suggested. (Tr. 770). In fact, despite reporting a "significant history of interpersonal problems with supervisors and coworkers," she also reported that she had never been fired from a job. (Tr. 304). And she told Dr. Boxer that she quit her most recent Amazon job due to diabetes - not mental health symptoms.[10] *See also Manning*

---

[10]Three months later in June 2016, Plaintiff gave a different report to the consulting psychologist. At that time, she stated that she took a leave from Amazon in 2015 "because 'my depression was getting bad and I hurt my shoulder'" and later took a "buyout" in February 2016 for unspecified reasons. (Tr. 304). She also more generally reported that she could not work because she could not "concentrate because my depression is so bad." (*Id.*)

*v. Com'r of Soc. Sec.*, 2018 WL 6011146, at *6 (S.D. Ohio Nov. 16, 2018) (treating physician's check-box opinions conflicted with plaintiff's reported history of steady part-time work), *adopted at* 2019 WL 3975867 (S.D. Ohio Aug. 22, 2019).

The ALJ's conclusion that Dr. Boxer's opinions were inconsistent with other substantial evidence in the record is strongly supported.  For example, the ALJ noted objective clinical observations throughout the record that "repeatedly documented that the claimant presented with normal mood and affect, normal behavior, and normal judgment and thought content (4F, p.14; 13F, pp.6-7, p.16; 20F, p.48, p.65, p.73)" and treatment records that documented that Plaintiff "appeared alert and oriented, and demonstrated intact attention and concentration. (Tr. 765).   In addition to her discussion of treatment records close in time to Dr. Boxer's opinions, the ALJ provided an extensive discussion of later mental health treatment records – an additional body of substantial evidence that conflicts with Dr. Boxer's 2016 and 2018 opinions.

> In January 2019, the claimant attended individual counseling with Patricia Habenicht, LSW, at Community Behavioral Health (15F, p.40). The claimant presented with appropriate appearance, cooperative behavior, normal thought content, euthymic mood, full affect, clear speech, good judgment, adequate insight, and appropriate motor activity (15F, pp.40-41). Then, in May 2019, the record indicated that the claimant stopped attending counseling due to variations in her work scheduled (15F, p.10).

> In April 2020, the claimant saw Ginger Justice, CNP, at Community Behavioral Health for medication management (18F, p.6). She reported having a modest reduction in anxiety since starting Clonazepam, and no anxiety attacks in seven months (18F, pp.8-9). She indicated that she was only getting twenty-four hours at work due to the Coronavirus (18F, p.9). The evaluation noted anxious mood, otherwise, generally unremarkable findings with normal speech, average vocabulary, normal thought processes, linear and logical associations, intact recent and remote memory, fair insight and judgment, and full orientation (18F, p.11-12).

> Then, in July 2020, the claimant's care was transferred to Erin Ackerman, CNP, at Community Behavioral Health (18F, p.28). The evaluation documented that the claimant was well groomed, engaged well with the examiner, and often used humor (18F, p.28). The claimant described

working full time at Rural King, even throughout the pandemic (18F, p.28). The record noted that she had been switched to Topamax and Lamictal, which was working well to control her mood (18F, p.28). The claimant reported being pleased with the current dose, and denied any anxiety attacks in eight months (18F, p.28).

Following, in December 2020, treatment records from Erin Ackerman, CNP, noted that the claimant reported no anxiety attacks but increased depression for a couple of weeks (18F, p.56). The claimant appeared friendly, cooperative, and engaged well with the examiner (18F, p.56). Ms. Ackerman encouraged the claimant to restart therapy, but she stated, "she doesn't have time" (18F, p.56). The claimant was assessed with persistent depressive disorder, anxiety disorder, subsyndromal posttraumatic stress disorder, and borderline personality disorder (18F, p.56).

Furthermore, the claimant returned to Erin Ackerman, CNP, in January 2021, which documented depressed mood and flat affect, otherwise generally unremarkable findings with normal speech, normal thought processes, normal thought content, fair judgment, fair insight, intact memory, intact attention and concentration, intact fund of knowledge, and intact ability to follow instruction (18F, pp.67-69). Ms. Ackerman made no medication changes, but again advised to restart therapy (18F, p.68).

Overall, the evidence of record failed to show that the claimant was precluded from the performance of all work. Conversely, the claimant has worked as a cleaner and catering helper at the light exertional level since the alleged onset (14D, pp.3-4; Testimony). Although, this work activity was slightly under substantial gainful activity, it does suggest that her impairments are not as limit[ing] as alleged."

(Tr. 771-772).

The handful of records on which Plaintiff relies do not undercut the substantial evidence on which the ALJ relied to support the "little weight" she gave to Dr. Boxer's RFC opinions. For example, Plaintiff points to a single record from her primary care physician dated September 28, 2015 in which she reported "delusional thoughts and admitted to having homicidal thoughts." (Doc. 8 at 3). However, the cited record indicates only a subjective report of "delusional thoughts *since she was 16*" years old (long before her alleged onset of disability), and "occasional" homicidal thoughts towards her ex-husband "but no plan and reports she would never do it." (Tr. 346 (emphasis added)).

22

There is no other evidence in the record that Plaintiff was delusional at any point, and Dr. Boxer's records clearly refute that alleged symptom.

Plaintiff also cites to more recent mental health records that she contends provide substantial evidence for Dr. Boxer's opinions. Again, the undersigned's close review of the cited records finds no support to overcome the substantial evidence on which the ALJ relied. In the interest of judicial economy, I will not detail every citation. However, by way of one example, Plaintiff cites to a January 2019 record by Dr. Boxer that includes his diagnoses of depression and anxiety. (Doc. 8 at 3, 13, citing PageID 1264). The cited page also includes the narrative comment that Plaintiff suffers only from "mild depression." (Tr. 1230). And Dr. Boxer notes in the same record that "[t]oday <u>pt does not c/o [complain of] depressive symptoms</u> but does report daily episodes of palpitations/hear fluttering" for which she is scheduled to receive a heart monitor. (Tr. 1226 (emphasis added)). On examination, Dr. Boxer notes objective clinical observations of normal speech, normal thought processes, linear and logical associations, with no abnormal or psychotic thoughts, fair judgment and insight, intact recent and remote memory, full orientation, and average fund of knowledge. (Tr. 1229-30).

For the reasons discussed above, the undersigned concludes that the ALJ provided "good reasons" for giving "little weight" rather than "controlling weight" to Dr. Boxer's March 2016 and April 2018 opinions. However, the undersigned alternatively concludes that any error was harmless because Dr. Boxer's extreme "check-the-box" opinions were "patently deficient" and unsupported by anything in his clinical records or elsewhere in the record. *Accord Holman v. Com'r of Soc. Sec.*, 2019 WL 696943, at **8-10 (S.D. Ohio Feb. 20, 2019) (affirming rejection of opinions by two treating physicians provided on similar forms that redefined "marked" and "extreme" limitations in a manner

that all-but-guaranteed work-preclusive limitations, collecting and discussing case law in which similar check box forms have been held to be "patently deficient"), *adopted at* 2019 WL 2384870 (S.D. Ohio June 6, 2019); *Phillips v. Com'r of Soc. Sec.*, 972 F.Supp.2d 1001, 1008 (N.D. Ohio 2013) (holding that ALJ's failure to give controlling weight to the opinions of a treating physician on similar grounds, despite being "very brief" in articulation, "was clear and made specific reference to exhibits in the record by way of support"); *see also Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001) (even though "medical opinions and diagnoses of treating physicians are entitled to great weight [,]" "the ALJ 'is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation'") (quoting *King v. Heckler,* 742 F.2d 968, 973 (6th Cir.1984)).

### b. Dr. Johnson

In a second part of her claim regarding the ALJ's assessment of the opinion evidence, Plaintiff asserts error in the ALJ's evaluation of the opinions of the consulting examiner, state agency psychologist Andrea Johnson, Psy.D. Recall that after a stipulated remand from this Court, the Appeals Council directed the ALJ to re-evaluate Dr. Johnson's opinions.[11] The Appeals Council stated that "the record does not support the Administrative Law Judge's conclusion that Dr. Johnson's opinion was based on the claimant's subjective reports, as she evaluated the claimant in June 2016 and her mental status examination revealed notable findings (*see*, Exhibit 3F)." (Tr. 897). The Appeals Council also criticized the ALJ's initial analysis as providing insufficient rationale to

---

[11]Plaintiff incorrectly states that *this Court* remanded "because of the ALJ's failure to properly evaluate Dr. Johnson's expert opinions." (Doc. 8 at 13). The joint stipulation entered as an order of remand did not state a basis for the parties' agreement that the case should be remanded.

discredit Dr. Johnson's opinions that "the claimant is likely to have significant difficulties with job related tasks due to mental health problems, and is unlikely to respond appropriately to coworkers in a work setting." (*Id*.)

Plaintiff asserts that the ALJ committed the same errors identified by the Appeals Council on remand by referencing Dr. Johnson's reliance on Plaintiff's subjective reports. However, the undersigned finds no reversible error. In her first (remanded) opinion, the ALJ's analysis of Dr. Johnson's opinion was very brief:

> [Dr. Johnson] opined that the claimant was likely to show a pattern of periods of time away from work for mental health reasons, but demonstrated no difficulties with comprehension of simple material. …Dr. Johnson saw the claimant only one time, and her opinion is based on the claimant's subjective reports, therefore, little weight is given.

(Tr. 34).

On her more recent decision, the ALJ appropriately expanded her analysis:

> [I]n June 2016, …, Andrea Johnson, Psy.D., performed a consultative examination and opined that the claimant presented with intellectual capacities consistent with functioning in the low average range (3F, p.6). Dr. Johnson indicated that the claimant performed below average on memory and recall tasks but demonstrated no difficulties with comprehension of simple material (3F, p.6). Dr. Johnson stated that the claimant was able to concentrate on questions and tasks throughout the evaluation (3F, p.6). In addition, Dr. Johnson opined that the claimant was likely to show a pattern of periods of time away from work for mental health reasons (3F, p.6). Dr. Johnson indicated that the claimant's interaction with the examiner was adequate, and she maintained distant relationships with family and friends (3F, p.6). However, Dr. Johnson added that the claimant had a history of significant interpersonal problems with supervisors and coworkers and was unlikely to respond appropriately to coworkers in a work setting (3F, p.7). Dr. Johnson stated that the claimant reported no mental health treatment history, but was prescribed psychiatric medication to help manage her symptoms (3F, p.7). Finally, Dr. Johnson stated that based on the claimant's self reported history, she was able to respond appropriately to work stressors and situations (3F, p.7).
>
> I found Dr. Johnson's opinion largely inconsistent with longitudinal medical record. For example, treatment records have repeatedly documented that the claimant presented with normal speech, normal thought processes, normal thought content, fair judgment, fair insight, intact memory, intact

25

attention and concentration, and intact fund of knowledge (18F, pp.11-12, pp.67- 69). Additionally, Dr. Johnson based large portions of her opinion on the claimant's subjective reports, such as the claimant's report of having significant interpersonal problems with supervisors and coworkers (3F, p.6). However, the claimant's self-reported history of difficulties with supervisors and coworkers seems inconsistent with her ability to maintain employment at Amazon for seven years, Wal-Mart for nine years, and Rural King since December 2019 (3F, p.4). Further, Dr. Johnson found that the overall interaction with the claimant was adequate (3F, p.7). The claimant's treatment providers have also documented that she presented as friendly, cooperative, and engaged well (15F, pp.40-41; 18F, p.28, p.56). Consequently, I gave little weight to this opinion.

(Tr. 775).

Plaintiff argues that the above analysis is still too "superficial and cursory" because Dr. Johnson's report "documented various mental health symptoms and signs that supported her diagnoses and opinions." (Doc. 8 at 14). But Plaintiff points to no specific evidence that would support any greater limitations. For the reasons discussed, and based upon the substantial evidence in the record that strongly supports the ALJ's mental RFC as determined, the undersigned finds no error in the ALJ's expanded reasons for giving "little weight" to Dr. Johnson's opinions.

In addition, the undersigned notes that Dr. Johnson's relatively vague 2016 opinions arguably are consistent with most of the mental RFC limitations as determined. Dr. Johnson opined that Plaintiff is "likely to have significant difficulties with job related tasks due to mental health problems," but did not translate that into any specific functional limitation. (Tr. 306). In the same section containing that opinion, Dr. Johnson opined that Plaintiff was able to understand and follow directions, had "no difficulties with comprehension of *simple* material," had no difficulties in concentration or pace during the exam, and would likely have a work pace "similar to that of her work peers." (*Id*., emphasis added; *see also* Tr. 307). Noting Plaintiff's subjective report of difficulty in maintaining pace at past jobs, Dr. Johnson concluded she is "likely to show a pattern of

time away from work for mental health reasons." (Tr. 307). But Dr. Johnson simultaneously opined that Plaintiff "is able to respond appropriately to work stressors and situations," and has "adequate social supports in place to effectively cope with additional stressors." (Tr. 308). Apart from Dr. Johnson's undefined reference to possible "time away from work," the ALJ's limitation to simple unskilled work with only "routine tasks in an environment without any fast-paced tasks or strict quotas," and with minimal job changes, accommodates the limitations that Dr. Johnson suggested.

Noting Plaintiff's report of difficulties with supervisors and coworkers in the past, Dr. Johnson also opined Plaintiff "is unlikely to respond appropriately to coworkers in a work setting." (Tr. 307). However, Plaintiff stated that she had never been fired from any job and had taken a buy-out from her most recent long-term job at Amazon. (Tr. 304). Again, the limitation to "no interaction with the general public and occasional interaction with coworkers and supervisors," with "no joint tasks and no over-the-shoulder supervision" arguably accommodates Dr. Johnson's opinion by greatly restricting interpersonal interactions.

### III.  Conclusion and Recommendation

For the reasons stated, **IT IS RECOMMENDED THAT** the decision of the Commissioner be **AFFIRMED** as supported by substantial evidence and that this case be **CLOSED**.

 *s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

LISA C.,                                                    Case No. 1:21-cv-496

      Plaintiff,                                        Cole, J.
                                                           Bowman, M.J.

    v.

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.


## NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).